Our next case this morning is Tachias v. Sanders, number 22-2139. Counsel, you may proceed. Good morning, distinguished judges of the panel, Honorable Judge Mathison, Honorable Judge Bachrach, and Honorable Judge Ide. My name is Carlos Quinonez. I'm an attorney representing Appellate Dana Sanders, and this appeal is being taken from the United States District Court, District of New Mexico, involving denial of my client, Ms. Sanders' motion for qualified immunity. The Los Lunas School District is, by New Mexico standards, a rather large school district. Fifteen schools, about 8,500 students. Under New Mexico law, the superintendent of schools is the chief executive officer of the school district. My client, Ms. Sanders, was the superintendent of Los Lunas School District from 2014 to 2020. A school superintendent has a very difficult job facing uncertainties and dilemmas each and every day, and this is especially true regarding the most fundamental and important duty for any superintendent like Ms. Sanders, protecting the safety, security, and well-being of the 8,500 children attending her schools. The key event that led to the seeking of the trademark for the school district and that led to the cease and desist letters against plaintiffs was based upon this fundamental duty to protect children, and it's being compromised in the manner that occurred. Namely, an allegation of misconduct was made against a middle school principal for allegedly threatening a middle school student. It could not be properly investigated. Was that protected speech? I'm sorry? Was that protected speech? Well, Your Honor, I guess the question that we have here in this case is meeting at the intersection of the First Amendment and qualified immunity, and it may very well be, but again, we think this ties in to qualified immunity, and we certainly, notwithstanding that statement, we contest whether or not plaintiffs were involved in free speech. And again, Judge, just so I can elaborate on this incident, this incident could not be properly investigated, and again, the circumstances we have in this case are very unusual. Due to the plaintiff's Facebook content going viral over a weekend, and then the school district could not conduct an investigation, and this young student, this situation could not be properly investigated. The student's parents came to the school district a few days later after this crucial weekend to complain, and again, the school district went out there and interviewed people and could not conduct its job. Mr. Kidone, I don't mean to interrupt you. No, that's fine. I apologize, but back to Judge Matheson's question. So, Superintendent Sanders may have had all of the best intentions, the most meritorious grounds for being concerned about the content on the Facebook page, but didn't we hold in Smith v. Plattie that hosting content on a website is, quote, undoubtedly an activity protected by the First Amendment? So, even though it may have been abhorrent what they were saying about the principal's misconduct and his son, isn't it, back to Judge Matheson's question, clearly established an indisputably protected activity of the content that was posted? And Judge Bachrach, again, I think, again, we would contest some of the plaintiff's First Amendment rights here, but generally speaking, the content, again, on a social media site, I guess all the old cases were in the newspapers and that sort of thing. So, we would agree with you on that point. Okay. So, that's the first of the three more elements, right, that it was protected activity. And again, what we have to do here, obviously, is look at the qualified immunity issue as well. But, yeah, but we look at qualified immunity through the prism of whether or not it was clearly established constitutional violation. And so, in order to evaluate prong two of qualified immunity, don't we need to look at the three elements of 4L and see if there's really any dispute that could be fashioned about whether or not those three elements were satisfied, whether it was protected activity, whether it chilled a person of ordinary firmness, and whether there was a retaliatory motive. Don't we have to go through that analysis to see whether or not it was clearly established? Yes, I think you do. And, again, that's why I'm saying this case meets at this intersection, kind of an unusual intersection under the facts of the case, qualified immunity, First Amendment issues. And we would advance the argument 4L versus Henry as an opposite. This is a case about withdrawal of a job offer based upon expert trial testimony the plaintiff had given nine years earlier. And the right that was asserted there was a First Amendment right to testify truthfully in court. And the 4L case also involved public employment. So it was a public employee, and the court had to engage in the Pickering test. And we believe much of that decision rested on that. Here, in contrast, we don't have the Pickering analysis applicable. We have these two plaintiffs who run this Facebook site. They are not public officials, members of the public, administrators of this website. And, again, what we think is in the context, let me maybe address your First Amendment inquiry first, Judge Bachrach. And one of the things is, as far as the essential elements, was the government official substantially motivated by the First Amendment expressions. And we would submit that's not true. We don't believe Ms. Sanders was trying to issue a gag order on public speech. What she was trying to do was to avoid a future scenario whereby, again, the interest of protecting the children was being compromised by this website. Now, could she have done it better? Maybe so. And that's why qualified immunity exists. Could I just ask you to clarify one thing about your qualified immunity argument? So the district court determined that the evidence was sufficient for a jury to find a constitutional violation. That would be prong one of qualified immunity. Are you challenging that part of the qualified immunity decision by the district court? Or are you arguing on appeal just the clearly established law part of qualified immunity? Yeah. And I guess I would be arguing both. But let's go to the qualified immunity because that's what I believe the case is about. Have you argued the first prong in your brief? As far as the summary judgment motion? You mean the First Amendment issue? Well, I suppose another way of putting it is have you argued that the district court erred in determining that a reasonable jury could find a First Amendment violation? We believe so, Your Honor. So I mentioned the substantially motivated prong. Another one is whether or not a person of ordinary firmness would be chilled in their speech. We don't believe this was properly addressed by the district court. And, again, we know it's a reasonable person standard on that particular prong. But this court in Smith v. Platte, P-L-I-A-T-I 258, F-30 1167, said, Very interesting compared to this case. The officials, whether the officials act with chill or silence a person of ordinary firmness, is a reasonable person standard, but then noted, Nevertheless, the plaintiff's persistence in maintaining his website offers some evidence that the defendant's actions did not prevent such private speech. So I think there are some facts here. But, of course, whether or not there's some evidence, it really is an opposite to the Rule 5016, right? We have to view the evidence in the light most favorable to the non-movement, right? Yes, absolutely. And back to Judge Matheson's question about the sufficiency of the evidence. So let's take prong three, the retaliatory motive. Do we have jurisdiction to revisit the district court's finding that viewing the evidence in the light most favorable to the non-movement, there could be a reasonable jury finding that there was a retaliatory motive? And as I understand it, under Beth v. Hines, we have a number of cases that, except with very limited exceptions on interlocutory review, we don't have jurisdiction to consider whether or not the district court erred in concluding that there was a triable issue of fact. So how can we revisit what the district court found on a retaliatory motive? Yeah, and again, this was in some of the briefs, but we agree, Judge Bachrach, what we're here on is on clearly established law. Right, and so in evaluating whether it was a clearly established violation, don't we have to credit the district court's conclusion that there, because this is just a pure question of historical fact, somebody's motive. It's not a mixed question. It's a pure fact question. Don't we have to credit the district court's conclusion that a triable issue, a reasonable jury, could have found a retaliatory motive? And if there was a retaliatory motive, how could a plainly competent superintendent of education conclude otherwise, that prong three of the Warale test was satisfied? Yeah, and again, Your Honor, I think the big point we made in our briefs is the plaintiffs did not meet their heavy two-part burden on the qualified immunity analysis. I understand what you're saying on Rule 56, and that's why I'd like to now focus a little more on the QI analysis, if I may. Well, when you say two-part, part two is clearly established law, correct? Yes, and whether it was violated. And you have argued this morning that Warale involved different circumstances than this case. But what about our decision in Beadle? Why isn't that, it may not be on all fours with this case, but why isn't it factually analogous to this case? Your Honor, in Beadle, I think the main inquiry of this court was this hospital in Oklahoma, a governmental unit that was thereby authorized to bring this, I guess the issue was malicious prosecution suit in that case. And that whole decision rested on that particular analysis. Now, we would submit there is no clearly established law, but a Facebook site name, which uses a school's trademark that disrupts and intrudes upon the legitimate pedagogical operations of a public school teacher. Let's just ask you, though, I understand there was the litigation in Beadle, the libel case that was filed. But in this case, didn't the cease and desist letter threaten litigation against the plaintiffs? Yes, Your Honor, and again, we think there's three pieces of the evidence on what the motive was. We believe the earliest and best one was Ms. Sanders' school board update on some of these text messages to the board. Right after, three to four days after this incident at the middle school, saying I want that taken off, meaning the name. This parent discussion page is called Los Lunas Schools Parent Discussion Page, which is one of the first things back then that you would Google Los Lunas Schools that would pop up. That's what she wanted removed. And then we have the cease and desist letter, which I think we can probably agree could have been worded much better by the school's attorney. And then we have this post cease and desist letter between the attorneys for the parties where it's reemphasized by the school's counsel. All we want them to do is change their name. And the plaintiffs did that for 30 days, changed the name and then went back to it. And that's why this other case I mentioned earlier, we think kind of fits in that. In fact, there was no chilling of speech. Could there have been a viable trademark infringement action when the Facebook page was not connected to goods or services? Yes, we believe so. Again, the trademark was obtained through completely lawful means. I understand the trademark was obtained. But what I'm asking you is whether there's anything actionable based on the trademark when the Facebook page isn't engaged in goods and services. Yeah. And then again, maybe that's a little bit speculative because that didn't happen here. And again, we understand, Judge, with the cease and desist letter, which talked about that. But again, we feel there's other evidence of what the motive may have been for Ms. Sanders. With that, I'm going to conclude my argument. Thank you, Honorable Judges. Any other questions? No, thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Matthew Beck. With me is Mr. Leon Howard. We represent the plaintiffs, Rowena Tachias and Monique DiRetta. The District Court correctly found that the defendant's conduct was unconstitutional under clearly established law for three reasons. The first is that it is materially similar to Beadle v. Wilson, this Court's decision in 2005. The second is that clearly established principles govern that the retaliation here was unconstitutional. The third ground, any of which this Court should affirm, is that the violation of the First Amendment applies to the circumstances before this Court with obvious clarity. Now, in this Court's 2005 decision in Beadle v. Wilson, that case is materially similar because the Court said, and I quote here, a governmental lawsuit brought with the intent to retaliate against a citizen for the exercise of his First Amendment rights is itself a violation of the First Amendment and provides grounds for a Section 1982 statute. We didn't have a lawsuit filed here, so why isn't that a material difference with Beadle? Thank you, Your Honor. It's because of what this Court said in Worrell in 2000, which is that any form of, quote, legal harassment, including prosecution or threatened prosecution, meets that second standard. What is legal harassment? You know, I noticed that and I think I may have actually looked at Black's Law Dictionary and I looked for definitions of legal harassment. I can imagine all sorts of legal harassment, but a demand letter that I'm sure you have sent me, I'm sure opposing, I'm sure every lawyer that is going to appear before us has probably sent demand letters, but I've never regarded that as harassment. And why wouldn't it be reasonable for a superintendent to think that a cease and desist letter is not exactly harassment? Why would it be obvious to a plainly competent superintendent of education that a cease and desist letter or even a threat to sue is harassment? Your Honor, I don't think the Court needs to define legal harassment, but I certainly think that the threat of a, as this district court found below, a, quote, frivolous lawsuit is legal harassment. I also think that threatening in that letter a frivolous lawsuit based on trademark when the trademark is not used and then requiring these unrepresented plaintiffs to sign an agreement that gives away all their rights or says that they're going to be reimbursing the school district, the government's legal fees, I think that that's legal harassment. But again, Wuerl says that threatened prosecution is also grounds for basically that objective standard of chilling. Threatening a criminal, right, a criminal prosecution. I don't know. In Wuerl, it was not a threat of criminal prosecution. I think that's probably more of a bumper sticker than actually discussing it in Wuerl. But I think traditionally, if you look back at the Bantam Books case, threatened prosecution was criminal. But I also think threatened prosecution can be threatened prosecution with a civil lawsuit. And I think that that is a clear thread through the Supreme Court's First Amendment precedent here, is that the threat of a civil lawsuit can be more threatening to a person of ordinary firmness than a criminal lawsuit. And that goes all the way back to New York Times against Sullivan, where they pointed out that when you're threatened with criminal prosecution for libel, you would be subject to some kind of probably misdemeanor. Whereas a company like the New York Times is threatened with the civil prosecution of libel, it can be brought by any number of parties and those damages could foreclose a company like the New York Times against Sullivan. Let me get into that. Well, before we leave this line of questioning and Beadle, isn't another significant difference between this case and Beadle that the district actually did go out and get this trademark? You don't have that in Beadle. And one way of thinking about clearly established law, the way the courts phrase it, is whether a reasonable, in this instance, superintendent in the circumstances of Ms. Sanders, would that reasonable superintendent think that what was being done here was a constitutional violation, especially when the lawyers are telling her, you know, get this trademark. Oh, in fact, they actually did go out and get this trademark. Why isn't her following the lead of counsel, if you will, enough to take this outside of clearly established law? Let me take what I think was a two-part question. It may have been three or four parts, Your Honor. First of all, whether you seek a lawyer's advice has no implication in the qualified immunity inquiry. Do you have any authority for that? Your Honor, I think that if there were some exception intended in qualified immunity, that if you had the advice of counsel to do this, it would not be an objective inquiry of what a reasonable officer would do. It would be established in the case law that it would be what a reasonable officer would do. What if a district attorney is consulted about a search warrant and said, you know, it's fine, go ahead, and it turns out that it was clearly a violation of the Fourth Amendment, but the officer was told that it was fine. Would the officer not have qualified immunity? That inquiry is different, Your Honor, and I think you'll find this in the A.N. versus Seiling case, and you'll also find it in White against Pawley and the Mullenix case from the Supreme Court, as they have made clear, as this court has, and as Your Honor has in the Ashaheed case, that the inquiry for a Fourth Amendment qualified immunity test is functionally different than First Amendment, because what you have in the Fourth Amendment – Well, in the excessive force context, but what does that have to do with reliance on counsel? It has to do with the objective reasonableness. So you asked about a district attorney. Then you have belief that there is – Well, I'm just asking you for a case. Sure. It doesn't sound like you have a case. I don't have a case at my hands, but if it were the case that you could go to advice and get counsel and then proceed and be insulated from qualified immunity, then that would stop qualified immunity inquiry, because every official would go and find counsel. Well, is that what happened here? Did she go for advice, or did the – what happened here? That's not established in the facts. The facts are clear. They're undisputed that the appellant, Sanders, was the person who applied for a trademark. It was not any attorney who applied for a trademark. And it is not clear what – So that was an uncounseled application. She filed an uncounseled application for trademark, exactly. And that goes back to the first part of that two- or three-part question that Your Honor asked, which is when she did this and she went out and thinking that, how is that not overcoming qualified immunity? And the answer is found in the Villarreal case from the Fifth Circuit quoted by the district court below, going back to Justice Thomas's dissent – or, excuse me, his affirmance of the denial of certiorari for a university case in qualified immunity. And what he said, similar to what I was saying this court has established in the Fourth Amendment context, is that when you have a university official who, unlike an officer out on the streets, is not making the split-second decision, why are we providing them the same level of qualified immunity when they had, in this case, almost a year to think about what they were doing and make sure it was qualified immunity versus the police officer who's making that split-second decision? And this circuit has been clear that in that Fourth Amendment context, you need to be more particularized about the exact case law. If this court goes back, and this goes into the clearly established principles and sort of the obvious clarity, is if this court looks back at the Worrell case, and I disagree that it does not apply to the factual circumstances here, this circuit and Worrell looked at two different circumstances. The DA who denied the person the job and said in that case it is an employer situation where we have a balancing test, no violation of clearly established rights. Then they looked at the officer in the Drug Enforcement Task Force who made the statement to the DA that I would never work with this person because they testified for a murderer. And they said this officer, who is not employing the person, is not entitled to that balancing test. This is plain First Amendment violation. There's no balancing test, it's just the government cannot discriminate. And what it said for that First Amendment violation for this defendant, Turner, is it said, quote, under the framework of First Amendment retaliation, quote, intent is the key element. An act taken in retaliation for the exercise of a constitutionally protected right is actionable under 1983, even if the act, when taken for a different reason, would have been proper. This gets back to your question, Judge Bacharach, about whether this trademark is enforceable. When we're looking at First Amendment retaliation, this circuit doesn't have to answer that question. The court in the world goes on to say here, the unlawful intent inherent in such a retaliatory action places it beyond the scope of an official's qualified immunity if the right retaliated against was clearly established. And that makes sense because functionally it seems wrong that we have First Amendment retaliation and we say, well, has anyone retaliated on use of a trademark before? You look at the Rosales case where it's obvious clarity. What Worrell instructs us is when we're looking at First Amendment retaliation, we look at the right that was violated. Let me ask you, though, the first and third elements, I think unquestionably, relate to whether or not the title, the name of the school district, is constitutionally protected. Now, we certainly have cases, as you point out, that say that titles naturally can often connote protected speech. But what about when it's the name of a governmental entity? And to give some context to the question, let me ask you a hypothetical. Let's say Bob Bacharach, that's me, I decide to open up a Facebook page, 10th Circuit Court of Appeals, United States Courts, legal advice from the bench. And I start pontificating all of the things that I think the law requires and doesn't require. And I get a letter from General Garland saying, Judge Bacharach, you need to take off 10th Circuit Court of Appeals, United States Court of Appeals. This is certainly confusing. You are a – everybody is going to be thinking that this is coming from the court. It's coming from you, a guy. And I say, hmm, that's great. I'll take it off. And then I sue the United States. I file a Federal Tort Claims Act suit. Now, and I say, well, under Worrell, that's constitutionally protected. That title is constitutionally protected. You're retaliating because I used that title. And I am certainly chilled. It would chill a person of ordinary firmness when they get a cease and desist letter from the Attorney General of the United States. So do I have a right to overcome General Garland's, say, if it's a – to change my question, it's a suit against General Garland in his personal capacity. Does he have qualified immunity? Under the circumstances you gave me, obviously, this is divorced from the case at hand because a lot of those – Well, it's the same thing. Under the – It's a title of a governmental entity. I think what Worrell would say is no, there is no qualified immunity because what Worrell says and what is the theme throughout these retaliation cases is that retaliation is the key that takes it outside of the qualified immunity context. Now, you're going back to Attorney General Garland. If his intent there was to retaliate against the speech on your page because he disagreed with it as it was here – The title. He didn't like my title. If he didn't like your title, then yes, again, he's not entitled to qualified immunity because it is clear from Smith v. Plotty in the Tenth Circuit that the title, the hosting of a page, is protected. Now, I think there would be a question there, of course, under the Supreme Court's more recent decision in Jack Daniels' case about source confusion. That's something we don't need to go down here because there are no facts. that this page ever put itself out as coming from the school district. That's a very big difference here than Jack Daniels. And so what you have here is you have that there may be some confusion, but the undisputed facts are that the reason the trademark was sought was because there was content on the page that the school district disagreed with that made it harder for the school district to do its job. You heard about the middle school principal, the post about the middle school principal threatening a middle school student. That is the same kind of discussion of public affairs that New York Times against Sullivan said that government has no power to seek any damages through the law for that content. The cease and desist letter, once it was very quickly revised, was not anything related to the content. It was to take that title off. And the title, it was related to the content. The content never changed. It was always that there was speech on the page that the school district said was wrong or was criticizing the school district. That's the same thing as Tinker wearing his black armband into the school in Des Moines, Iowa. It's the same thing as Paul Cohen wearing his fuck the draft jacket into the Los Angeles courthouse. It's the same thing as the cheerleader saying fuck the cheerleading squad, fuck the school district. It is speech with which the government disagrees, but it is protected and that is clearly established. And I see my time is up. Counsel, could I just quickly, I think I mispronounced your client's name. Could you say it again so I have it right? Tachias. Tachias, thank you. I did too for a long time and she corrected me quickly. Thank you, Your Honors. Thank you, Counsel. I don't believe there was any rebuttal time. So that will complete arguments in this case. I appreciate the arguments this morning. The case will be submitted and counsel are excused.